IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | |
|---|---|
| v. | CRIMINAL ACTION NO. 16-517 |
| KEVIN JAMELLE ARCHIE, Defendant. | |

**OPINION**

Slomsky, J.                                                                                                                                                         May 17, 2017

## I. INTRODUCTION

Before the Court is Defendant's Motion to Suppress Physical Evidence (Doc. No. 20). In the Motion, Kevin Jamelle Archie ("Defendant") asserts a Fourth Amendment challenge to his personal seizure by the Government and the seizure of a Glock Model 17, nine millimeter semiautomatic handgun (the "firearm"). Defendant asserts that the firearm must be suppressed because Philadelphia Police Officer Anthony Agudo lacked the necessary reasonable suspicion to stop and seize him, and that the finding and seizure of the firearm was the fruit of his illegal seizure.

The Government filed a Response in Opposition to Defendant's Motion to Suppress Physical Evidence (Doc. No. 27), and the Court held a hearing on the Motion on April 18, 2017. For reasons that follow, the Court finds that the seizures of Defendant and the firearm were lawful. Accordingly, Defendant's Motion to Suppress (Doc. No. 20) will be denied.

## II. FACTUAL FINDINGS

Defendant Kevin Jamelle Archie is charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (Doc. No. 9.) The seizures occurred on

September 10, 2016 and an evidentiary hearing on the Motion was held on April 18, 2017. At the hearing, the Government presented the testimony of Philadelphia Police Officers Anthony Agudo and Officer Keven Creely.

Officer Agudo testified that he has been a uniform patrol officer with the Philadelphia Police Department in the 24th District for about two years. (Doc. No. 33 at 7.) On September 10, 2016, he was working two shifts, back-to-back, from 4:00 p.m. to 4:00 a.m. (Id.) That night, he was in a patrol car with Officer Creely, who was driving. (Id. at 8.) At approximately 12:20 a.m., the officers received a radio call informing them that a person with a gun was at the intersection of Frankford and Pacific. (Id. at 9.) The person was described as "a black male, 5-7, wearing a grey tank top and black shorts." (Id.) Officer Agudo testified that at the time he did not know where that information came from, just that they received it from the dispatcher. (Id.) Their patrol car left headquarters at 3901 Whitaker Avenue, and the officers went straight to the location identified in the radio call. (Id.)

Once the officers arrived at the location noted in the radio call, they saw two black males, one of which fit the description of the person in the radio call. (Id. at 10.) At the hearing, Officer Agudo identified Defendant Archie as the male he determined fit the description of the person referred to in the radio call. (Id.) Officer Agudo next testified as follows:

> Q: And what was [Defendant] doing when you first saw him?
>
> A: [When] I first saw him it appeared that he looked towards our direction as we were coming up northbound on Frankford Avenue and then he began to walk eastbound with that male that he was with and they walked eastbound on the northbound sidewalk.
>
> * * *
>
> Q: And, once you saw them walking eastbound, what happened then?

> A: At that time, my partner made a right hand turn, so we went eastbound on 2000 Pacific, saw that he was matching the flash information given to us by the police radio, I got out --
>
> Q: When you say "he", who are you talking about?
>
> A: The defendant.
>
> Q: Thank you.
>
> A: So, at that time, I exited the patrol car and I went around back as my partner kept moving forward eastbound, like, following the defendant.

(Doc. No. 33 at 12-13.)

Officer Agudo then saw that the two men had split up. The second man, also a black male, walked eastbound on the northbound sidewalk, while Defendant "went in-between two parked vehicles" on the northbound sidewalk. (Id. at 13.) Argudo saw Defendant drop a black metallic object. The officer heard it fall. (Id.) When asked about Defendant's body position as he placed the object on the ground, Officer Agudo stated: "It appeared that he just, like, bent down a little bit, as he was looking towards the -- in the direction of the police vehicle, and then just kept walking across the street" in front of the police vehicle that Officer Creely was driving. (Id. at 16.)

> As Officer Agudo explained:
>
> I heard like a clink -- clinking sound, I saw the black object hit the ground. And then I kept going, like I was kind of, like, crouched down trying to, like, sneak up towards the defendant, and then when I passed, like, where he went in-between the cars, I saw that there was a firearm on the ground, that was black in color. At that time, I looked up and he was crossing the street. It was on the -- now, the southbound sidewalk. I crossed in front of the police vehicle and I grabbed the defendant. I had placed him into handcuffs. I asked him to get on the ground for me. He did. I yelled to my partner that there was a gun across the street and the other male that was on the sidewalk began to run eastbound. And that's when my partner, he fled and went to chase the other male.

(Id. at 14.)

After Officer Agudo placed Defendant in handcuffs, he went across the street with Defendant in order to have the firearm "next to [him] in plain site [sic]. . . ." (Doc. No. 33 at 18.) Agudo said that the firearm was on the street "in front of the left front tire of the car" with no other items or trash around it. (Id. at 18-20.) A short time later, Officer Creely came back with the other male. Officer Creely then retrieved the weapon. (Id. at 18-19.)

Officer Creely testified that he has been a uniform patrol officer with the Philadelphia Police Department in the 24th District for fourteen years. (Id. at 33.) On September 10, 2016, he was working two shifts, back-to-back, from 3:00 p.m. to 3:00 a.m. (Id.)

Officer Creely described the rate of crime in the vicinity in and around the 2000 block of Pacific Street as follows:

> A: The area itself is violent, within a block radius, there's open area drug sales. I've responded to shootings there. I've responded to homicides on the 3600 block of Frankford.
>
> Q: Is that near Pacific Street there?
>
> A: Yes. That's right there.
>
> Q: And that was before this incident that we're talking about, today?
>
> A: No, it was after.
>
> Q: The homicide was?
>
> A: Yeah. But the shootings and the stabbings, I've responded to around there.
>
> Q: All right. And for how long [can you] remember had this type of crime that you described been going on in that area?
>
> A: Pretty steady since I've been there.

(Id. at 35-36.)

Officer Creely testified that he too saw the male that fit the flash description, whom he identified as Defendant Archie, bend down right by the front of a vehicle. (Id. at 39.) As

4

Defendant crossed the street, Officer Creely yelled "Yo, buddy." (Id. at 40.) After Officer Creely saw that Officer Agudo had Defendant in handcuffs, he pursued the other male in the patrol car as the other person started to run eastbound on Pacific Street. (Id.) Officer Creely testified about the pursuit of the other male as follows:

> Q: Can you describe how that pursuit went? What did you do specifically, sir?
>
> A: He went -- he ran eastbound on Pacific, he made a left hand turn onto the 3600 block of Amber Street and then he did a westbound -- he made a left hand turn onto the 2000 block on Pickwick, at which time, he tried to duck into an alleyway on the 3600 block of Frankford.
>
> Q: And what happened when he tried to duck into the alleyway?
>
> A: I was finally able to catch up to him and place him into custody.
>
> Q: And what did you do once you placed him in custody?
>
> A: Took him, put him in the police vehicle and went back with my partner.

(Id. at 42.)

When Officer Creely arrived back at the intersection of Frankford and Pacific, he recovered the firearm. (Id. at 43.) The firearm was on the street surface, "by the front tire, driver's side." (Id. at 44.) Officer Creely unloaded the firearm, and held it for placement on a property receipt. (Id. at 44-45.)

### III. CONCLUSIONS OF LAW

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "It must always be remembered that what the Constitution forbids is not all

5

searches and seizures, but unreasonable searches and seizures." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005) (quoting Elkins v. United States, 364 U.S. 206, 222 (1960)).

In the seminal case Terry v. Ohio, 392 U.S. 1 (1968), the United States Supreme Court created an exception to the Fourth Amendment warrant requirement. Under the Terry exception, a police officer may conduct a brief investigatory stop when the officer has a reasonable suspicion based on articulable facts that a crime has been committed. Id. at 21-22. "Any evidence obtained pursuant to an investigatory stop (also known as a '*Terry* stop' or a 'stop and frisk') that does not meet this exception must be suppressed as 'fruit of the poisonous tree.' " United States v. Torres, 534 F.3d 207, 210 (3d Cir. 2009) (quoting United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006)). A Terry stop is a seizure under the Fourth Amendment.

Thus, the first step of a Fourth Amendment suppression analysis requires determining whether a seizure occurred. Torres, 534 F.3d at 210. "An actual physical touching is not required to constitute a seizure of a person, but in the absence of a physical touching, there must be a submission to an officer's show of authority." Black v. Montgomery Cty., 835 F.3d 358, 365 (3d Cir. 2016) (citing California v. Hodari D., 499 U.S. 621, 626 (1991)). A seizure does not occur when there is not a submission to a show of authority. Hodari D., 499 U.S. at 626. For example, the Supreme Court held that the word 'seizure' "does not remotely apply . . . to the prospect of a policeman yelling 'Stop in the name of the law!' at a fleeing form that continues to flee. That is no seizure." Id.

Once it is determined whether a seizure occurred, the next inquiry is "whether that seizure was justified by reasonable, articulable facts known to the officer as of that time." Torres, 534 F.3d at 210. In order to conduct a Terry stop consistent with the Fourth Amendment,

6

a police officer "must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21.

> While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimum level of objective justification for making the stop. The officer must be able to articulate more than an "inchoate and particularized suspicion or 'hunch' " of criminal activity.

Illinois v. Wardlow, 528 U.S 119, 123-24 (2000) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989) and quoting Terry, 392 U.S. at 27).

In addition, as in this case, when property is seized, it must be determined whether it was seized incident to the stop or arrest of an individual, or in some cases, as abandoned property. A defendant who abandons property no longer has an expectation of privacy in the property which may be seized incident to the seizure of a person.

On a motion to suppress, "the burden of proof is on the defendant who seeks to suppress evidence. . . . However, once the defendant has established a basis for this motion . . . the burden shifts to the government to show that the search or seizure was reasonable." United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (internal citations omitted).

Given these legal precepts, Defendant argues that the firearm was seized after he was illegally detained by the police officers without reasonable suspicion, and that the gun must be suppressed as the fruit of his illegal detention. The Government argues to the contrary that the firearm was abandoned by Defendant before he was seized, and that in any event his seizure was lawful under Terry v. Ohio because the officer had reasonable suspicion to make the seizure based on articulable facts that a crime had been committed. The Court agrees with the Government and makes the following conclusions of law.

7

### A. Abandoned Property

Under the Fourth Amendment, the timing of the seizure is crucial. See Torres, 534 F.3d at 210. As noted above, there must be either the application of physical force, or a submission to a show of authority, for there to be a seizure under the Fourth Amendment. Hodari D., 499 U.S. at 626. In the absence of either physical force or submission to a show of authority, no seizure has occurred.

Here, when the patrol car stopped on Pacific Street and Officer Agudo got out of the car, the officers did not exert any authority to trigger a seizure under the Fourth Amendment. There was no seizure from that point through the dropping of the firearm by Defendant and his crossing to the northbound side of the street because Defendant did not submit to any show of authority by the officers. Only when Defendant was restrained by Officer Agudo did a seizure occur.

The next issue the Court must consider is whether Defendant abandoned the firearm before he was seized. As noted in Abel v. United States, 362 U.S. 217, 241 (1960), "[t]here can be nothing unlawful in the Government's appropriation of such abandoned property." "A court must determine from an objective viewpoint whether property has been abandoned. Proof of intent to abandon property must be established by clear and unequivocal evidence." United States v. Fulani, 368 F.3d 351, 354 (3d Cir. 2004) (citations omitted).

Defendant unequivocally intended to abandon the firearm. After the patrol car was near the scene, Defendant walked away from it. While walking, Defendant bent down next to a parked vehicle on Pacific Street and dropped a metallic object on the ground. (Doc. No. 33 at 13.) After Defendant dropped the metallic object, he walked in front of the patrol car to cross the street away from the parked vehicle and the object he had dropped. (Id. at 14, 39-40.) Then, Officer Agudo saw that the metallic object was the firearm in question. (Id. at 14.) Defendant's

actions clearly show that he intended to abandon the firearm next to the parked vehicle on Pacific Street. He did so before he was seized by Officer Agudo.

Because the firearm was abandoned before the Fourth Amendment stop and seizure of Defendant, "the recovery of the firearm did not flow as a consequence from Archie's seizure." (Doc. No. 27 at 9.) Consequently, Defendant's Motion to Suppress the firearm will be denied.

### B. The Terry Stop was Lawful

The Court also finds that there was reasonable suspicion under Terry to seize Defendant. Though the timing of his seizure occurred after Defendant abandoned the firearm, which did not trigger Fourth Amendment protection in the seizure of the firearm, the Court will still address the next step to be considered under the Fourth Amendment: whether the seizure was justified by reasonable, articulable facts known to the officer as of that time. Torres, 534 F.3d at 210.

Defendant argues that Officer Agudo seized him without reasonable suspicion at the outset of their encounter and thus the fruit of the encounter, the firearm, must be suppressed. (Doc. No. 20 at 5.) The Court disagrees. Although contested by Defendant, it is clear from the officers' testimony that there was reasonable suspicion to seize Defendant under the Fourth Amendment.

In order to make a valid Terry stop, a police officer "must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. Here, the Government argues, and the Court agrees, that "such reasonable suspicion existed, based on [Defendant's] actions in laying the metallic object on the ground near a parked motor vehicle and the walking away as was approached by police officers in a high-crime area in the early morning hours just after midnight." (Doc. No. 27 at 5.)

9

Contrary to Defendant's arguments, there were more articulable facts that warranted a Terry stop in this case other than the anonymous tip. The anonymous tip may have led the officers to the 2000 block of Pacific Street on September 10, 2016, but it was Defendant's actions after the officers appeared in a patrol car that gave the officers reasonable suspicion to stop him. Both officers testified that Defendant matched the flash description they received for a "person with a gun" in a high crime area, just past midnight. (Doc. No. 33 at 12-13, 37.) Additionally, Defendant bent down and dropped the object in the presence of the officers, and "the object's contact with the street surface emitted a metallic sound that would reasonably have lead an objective observer to conclude that the object was likely a firearm." (Doc No. 27 at 9.) Officer Agudo then identified the metallic object as a firearm before he detained Defendant. (Doc. No. 33 at 14.) Given the totality of these circumstances, Officer Agudo had reasonable suspicion to seize Defendant.

## IV.     CONCLUSION

For the foregoing reasons, the Court will deny Defendant's Motion to Suppress Physical Evidence. (Doc. No. 20.) An appropriate Order follows.