IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN JAMELLE ARCHIE,<br><br>           Defendant. | CRIMINAL ACTION<br>NO. 16-517 |

**OPINION**

**Slomsky, J.**                                                                                                              **August 4, 2020**

**I.      INTRODUCTION**

On May 16, 2019, a jury convicted Defendant Kevin Archie ("Defendant" or "Archie") of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).[1] (Doc. No. 145.) Before the Court are Archie's Motion for a New Trial pursuant to Federal Rule of Criminal Procedure 33 (Doc. No. 147), and a Supplemental Motion for New Trial. (Doc. No. 156.) In both Motions, Archie argues that he is entitled to a new trial because the Court erred in denying his request for a missing witness instruction in accordance with Third Circuit Model Instruction 4.16. (Id.) The Government filed a Response arguing that the Court did not err when it declined to give the missing witness instruction. (Doc. No. 159.) For reasons that follow, Defendant's Motions will be denied.

---

[1] 18 U.S.C. § 922(g)(1) provides as follows:

> (g) It shall be unlawful for any person– (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; … to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

1

## II. BACKGROUND

### A. Factual Background

The claim of error regarding the missing witness instruction stems from a 911 call that was received by the Philadelphia Police Department ("PPD") shortly after midnight on September 10, 2016. The 911 dispatcher received a call from an anonymous caller (Doc. No. 1 at 2), who was subsequently identified and interviewed at the direction of the Court by Justin Hines, a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). The 911 call was played at Defendant's trial, but the caller did not testify. The content of the call includes information pertinent to Defendant's Motion for a New Trial and is set forth in full as follows:

| | |
|---|---|
| 911 Caller: | [Voices in the background]  [Addresses third party in the background]  So come over and tell me. |
| Dispatcher: | [U/I]  May I help you? |
| 911 Caller: | Hi, um… I need a police car to uh, uh Frankford and Pacific. There's a guy outside standing with a gun. |
| Dispatcher: | Frankford and… Pacific? |
| 911 Caller: | Pacific. |
| Dispatcher: | You have a description of the male–[Voices overlap] |
| 911 Caller: | Huh?  [Voices overlap] |
| Dispatcher: | With the gun?  You have a description of the male with the gun?  Is he black, white or Caucasian. |
| 911 Caller: | He's um… black.  He's short–[Voices overlap] |
| Dispatcher: | [U/I].  [Voices overlap] |
| 911 Caller: | He has a gray–oh, he has a wife beater on.  He has black… um, ball [PH] shorts; he has sneakers on and he's standing at the corner [Beep] like–and with a gun in the back. |

2

| | |
|---|---|
| Dispatcher: | Are there other guy out there? |
| 911 Caller: | And there's other guys out there. He's scoping somebody out. |
| Dispatcher: | So, the gun is what in his–the back–behind in like his shorts or something? |
| 911 Caller: | Yeah. He's–you know, he has the… gun behind his neck. [Noises in the background] |
| Dispatcher: | Okay. And it's like an older male, younger male? |
| 911 Caller: | I'm not sure; I only seen how–he's like five foot seven. |
| Dispatcher: | Like a light or dark complexion? |
| 911 Caller: | Like a dark uh, complexion. |
| Dispatcher: | Dark complexion about five seven. All right, we're gonna get someone [U/I], okay? |
| 911 Caller: | All right. Thank you. |
| Dispatcher: | You're welcome. Thank you. |
| 911 Caller: | Bye-bye. [Voices in the background] |

(Doc. No. 124 at Ex. 1.)

When the call was transmitted over PPD radio, uniformed PPD Officers Anthony Agudo and Kevin Creely were in a police patrol car in the vicinity of Frankford and Pacific. (Doc. No. 1 at 2.) They responded to the area and arrived on the scene within minutes. (Id.) Upon arrival, they observed two black men. (Id.) One of the men, later identified as Archie, matched the description of a person described by the caller. (Id.) He was around 5'6, 5'7" and was wearing a gray tank top with black basketball shorts. (Doc. No. 153 at 37.)

Officer Agudo emerged from the vehicle to conduct a stop of Archie, while Officer Creely remained in the vehicle. (Doc. No. 1 at 2.) Prior to approaching Archie, Agudo observed him

3

bend down and place a black, metallic object on the ground near the front tire of a parked car. (Id. at 3.) Agudo heard a metallic noise as the object hit the ground. (Doc. No. 154 at 39.) Archie subsequently crossed the street. (Doc. No. 1 at 3.) The two officers called out to Archie and the other man to get their attention and for them to stop. (Id.) Archie was told to get on the ground. (Doc. No. 153 at 40.) Archie remained across the street and the second man immediately fled. (Doc. No. 1 at 3.) Creely pursued the man while in his police car and eventually detained him. (Id.) During that pursuit, Agudo approached and detained Archie across the street from where he placed the gun and waited for Creely to return. (Id.)

Once Creely returned in the police vehicle with the second man in the car, Agudo directed Creely to the area near the parked car where he observed Archie place the metallic object on the ground. (Id.) Creely walked over to that spot and saw a Glock 9mm semiautomatic pistol near the right front tire of the parked car. (Id.) He retrieved the firearm. (Id.)

Subsequently, Archie, who was has prior felony convictions, was arrested and charged federally with being a convicted felon in possession of a firearm, in violation of 18 U.S.C. 922(g)(1). (Doc. No. 9.) The second man was released.

**B. Defendant's Motions Addressing the 911 Call**

On June 28, 2017, Archie filed a Motion in Limine to Exclude the 911 call. (Doc. No. 51.) He argued that the recording was inadmissible hearsay and that its admissibility at trial would violate the Confrontation Clause of the Sixth Amendment to the United States Constitution. (Id.) While this motion was pending, Archie also filed a Motion to Compel Discovery Pertaining to the 911 Caller, requesting that the Court order the identity of the caller to be revealed to the defense and that he be afforded the opportunity to investigate and interview the caller. (Doc. No. 58.)

Archie further requested that if the identity was not revealed, the Government should be prevented from using the call at trial. (Id.)

On August 21, 2017, the Court held a hearing on the pre-trial motions. (Doc. No. 62.) During the hearing, the Court noted that it would require the Government to investigate the call by locating and interviewing the caller and determining if the caller would agree to be interviewed by the defense.[2]

Regarding Archie's Motion in Limine to Exclude the 911 Call, the Court, in an Order dated August 23, 2017, ruled that the 911 call was admissible under Federal Rule of Evidence 803(1) because the information contained in the call does not violate the rule against hearsay since it contained the present sense impression of the caller.[3] (Doc. No. 68.) Moreover, the Court found that the playing of the call by the Government at trial would not substantially outweigh any unfair prejudice to Defendant because the call justified why the officers went to the intersection of Pacific Street and Frankford Avenue in Philadelphia and provided corroborating evidence of Defendant's involvement in the offense. (Doc. No. 76 at 2-3.) Finally, the Court determined that the content of the call was non-testimonial because an emergency was being reported and for this reason, it did not violate the Confrontation Clause of the Sixth Amendment to the United States Constitution.

---

[2] On September 6, 2017, the Court ordered the Philadelphia Police Department to release the 911 caller's identifying information to the Government. (Doc. No. 70.)

[3] Federal Rule of Evidence 803(1) provides as follows:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> (1) <u>Present Sense Impression</u>. A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it.

See <u>Davis v. Washington</u>, 547 U.S. 813, 814 (2006).  (<u>Id.</u>)  At this point, Defendant's Motion to Compel Discovery Pertaining to the 911 Caller was still outstanding.

On September 13, 2017, ATF Special Agent Justin Hines and Task Force Officer Jack Grohl located and interviewed the 911 caller.  (<u>Id</u>. at 3.)  During the interview, the caller stated that she did not know either of the individuals and had never seen before the person in the sleeveless undershirt with the firearm.  (<u>Id.</u> at 4.)  Initially, the 911 caller informed the agents that she could not remember what shirt the gunman was wearing, only recalling that he was wearing a light-colored top with dark shorts and was approximately 5'8" in height.  (Doc. No. 159 at 5.)  She said the other individual was wearing all dark clothing.  (<u>Id.</u>)

The caller declined to talk to the defense and wished to remain anonymous.  (<u>Id.</u>)  In a phone interview the following day, the 911 caller remembered that the gunman was wearing black "ball shorts" and a "light-colored tank top."  (<u>Id.</u>)  In a subsequent interview of the caller on September 15, 2017, ATF personally met with the caller a second time and played the audio recording of the 911 call.  (<u>Id.</u> at 6.)  She confirmed that the voice on the recording was hers and that she had placed the 911 call.  (<u>Id.</u>)  A Report of Investigation documenting the interviews was provided to the Court and defense counsel, with identifying information redacted.

On September 28, 2017, the Court denied Archie's Motion to Compel Discovery Pertaining to the 911 Caller.  (Doc. No. 77.)  In an Opinion issued on the same date, the Court agreed with the Government's assertion that the 911 caller's identity should not be made available to the Defendant because of the need to protect the 911 caller from retribution and to encourage citizens to report crime by dialing 911 when necessary.  (Doc. No. 76.)  The Court reasoned as follows:

> This case involves an instance of a potential perceived threat to the 911 caller.  Defendant is charged with being a convicted felon in possession of a firearm and the 911 caller observed him with a firearm "scoping somebody out."  The facts of this case involve a

6

> dangerous situation that was averted by the 911 call and the actions of the police officers. Based on this scenario, the caller's safety is a legitimate interest in support of nondisclosure, and the public interest in protecting the flow of information is an overriding factor in this case, favoring nondisclosure of the 911 caller's identity.

(Id. at 7-8.) This ruling was made only in conjunction with Defendant's pre-trial motion. It did not preclude the defense from seeking to have the 911 caller subpoenaed to trial.

In October 2017, Archie went to trial. (Doc. No. 81.) After deliberations, the jury reported that it was deadlocked and the Court declared a mistrial. (Doc. No. 85.)

**C. Defendant's Second Trial**

A second trial was held on the gun charge. Before trial commenced, Archie filed a Renewed Motion in Limine to Exclude [the] 911 Call. (Doc. No. 124.) Archie also filed a Motion in Limine Addressing Admissibility of Description Evidence, seeking to prevent the Government from arguing to the jury that a "wife beater" is a "tank top" unless the Government called the 911 caller as a witness at trial to testify what was meant by "wife beater." (Doc. No. 129.) Archie further argued that if the Court agreed with him that, in the absence of the 911 caller testifying that by "wife beater" she meant "tank top," the Court should give the "missing witness" jury instruction similar to the one set forth in Third Circuit Model Criminal Jury Instruction 4.16. (Id.)

On May 14, 2019, the Court denied Archie's Renewed Motion in Limine to Exclude 911 Call. (Doc. No. 137.) The Court denied this motion for the same reasons that the Court denied the original motion on August 23, 2017. (Id.)

On the same day, the Court granted in part Archie's Motion in Limine Addressing Admissibility of Description of Evidence.[4] (Doc. No. 138.) The Court prohibited the Government

---

[4] No evidence that the Defendant matched the flash description provided to Agudo and Creely by the police dispatcher was introduced at trial. (Doc. No. 138 at n.1.)

7

from arguing that a "wife beater" is a "tank top." (Id.) The Court did not rule on the request to give the missing witness jury instruction. (Id.) Instead, the Court noted it would consider the appropriateness of such an instruction after hearing evidence at trial. (Id.)

The second trial was held over four days in May 2019. The Government's witnesses were: (1) Officer Anthony Agudo; (2) Officer Kevin Creely; (3) Officer and Firearm Examiner Ronald Weitman; (4) Caneshia Bailey, who works for the PPD in the audio reproduction unit; (5) Special Agent Justin Hines; and (6) Benjamin Levin, a forensic scientist employed by the City of Philadelphia in the PPD DNA laboratory. During Bailey's testimony, the 911 call was played. The defense called Catherine Cross, a forensic biologist and the DNA technical leader with Guardian Forensic Sciences, as a witness.

First, Officer Agudo testified regarding what he observed on September 10, 2016. (Doc. No. 153 at 36-37.) He confirmed that he received a police radio call shortly after midnight. (Id.). As a result of the information received on that call, he and Officer Creely, the driver of the vehicle, went to the intersection of Frankford Avenue and Pacific Street in Philadelphia. (Id.) Officer Agudo testified as follows:

> I initially saw two black males standing on the corner. And there was one male that was short, like 5'6", 5'7". He was wearing a gray tank top with black basketball shorts. And the other black male was tall, about 6-foot tall. He was wearing all black with a black shirt, black pants, and he had like short dreadlock hair.

(Id.)

Officer Agudo then identified Defendant as the person who was wearing the tank top that night. (Id.) Agudo stated that he got out of the car and saw Defendant stop and crouch between two parked vehicles. (Id. at 38-39.) He observed Defendant drop a black object on the ground before he crossed the street. (Id. at 39.) As the object hit the ground, Agudo noted that it made a

8

"metallic sound." (Id.) He called out to Archie to stop and get on the ground. (Id.) Archie complied. (Id.) While in the patrol vehicle, Creely pursued the other male who ran down Pacific Street. (Id.) Meanwhile, Agudo approached Archie and handcuffed him, and crossed the street with him to the location where he had seen the firearm placed. (Id.) Agudo testified that Creely recovered the firearm from the ground, after he returned from pursuing and securing the other man. (Id. at 41.) During his testimony, Agudo also identified the firearm that was recovered and Defendant's black shorts. (Id. at 42, 48.) Defense counsel cross-examined Agudo. (Id. at 66-81.) It was limited to the subject matter of what the officer observed, the arrest of Archie, and Archie's compliance with the officer's commands. (Id.)

Officer Creely, the driver of the police vehicle, also testified that he responded to the location at Frankford Avenue and Pacific Street as a result of receiving a police radio call. (Id. at 86.) He identified Archie and noted that on the night of the incident, he was wearing a gray tank top with black basketball shorts, and was approximately 5'7" in height. (Id. at 87.) Creely said that at first he pursued the second man. (Id. at 91.) He then returned to the scene and, based on direction from Agudo, recovered the firearm from the front of the tire. (Id. at 93.) The second man was released and Archie was taken into custody. (Id. at 94.) Creely also identified the firearm and the black basketball shorts that Archie was wearing when he was arrested. (Id. at 95.) Defense counsel cross-examined Agudo. (Id. at 102.) The cross-examination covered the subject of how the officer arrived at that location and what he observed. (Id.)

The Government next called firearm examiner Officer Weitman. (Id. at 106.) Weitman's testimony focused on his examination and report on the firearm retrieved from the scene. Defense counsel cross-examined Weitman on his report of the firearm investigation. (Id. at 118.)

The following day, the Government called as a witness Caneshia Bailey, who worked for the PPD in the audio reproduction unit. (Doc. No. 154 at 5.) During her testimony, the Government played the 911 call made by the anonymous caller on September 10, 2016. (Id. at 11-12.) There was no cross-examination about the 911 call.

Next, the Government called ATF Special Agent Justin Hines as a witness. (Id. at 13.) He identified Defendant's black shorts that were entered into evidence. (Id.) Hines obtained a photograph from Defendant's Facebook page, in which he was wearing a gray tank top, black basketball shorts, and leather-like shoes. (Id. at 17.) On cross-examination, Hines noted that wearing that type of clothing was common during the summer. (Id. at 15-19.) Most importantly, there was no testimony at all on direct or cross-examination about the 911 caller or Hines' interview with the 911 caller.

Before the Government rested its case, three stipulations were read to the jury:

> …(1) that the firearm listed in the indictment, a Glock model 17 .9-millimeter semiautomatic handgun, serial number D as in dog, K as in kilo, 433 has been test fired and found to be operable. It is a "firearm" within the definition of Title 18 United States Code Section 921(a)(3). That is, a weapon which will and is designed to expel a projectile by the action of an explosive… (2) that the firearm and ammunition listed in the indictment -- that is, a Glock model 17 .9-millimeter semiautomatic handgun, serial number DK433, loaded with ten live rounds of .9-millimeter ammunition, was manufactured outside the Commonwealth of Pennsylvania. By virtue of its presence in the Commonwealth of Pennsylvania on or about September 10, 2016, the firearm had traveled in interstate commerce… (3) that prior to September 10, 2016, the Defendant, Kevin Jamelle Archie, had been convicted in a court of the Commonwealth of Pennsylvania of a crime punishable by imprisonment for a term exceeding one year within the meaning of Title 18 United States Code Section 922(g)(1).

(Id. at 21-23.)

Next, defense counsel called forensic biologist and DNA technical leader Catherine Cross. (Id. at 24.) Cross' testimony was limited to DNA analysis on the gun recovered in this case. On rebuttal, the Government called Benjamin Levin, a forensic scientist in the PPD's DNA laboratory. (Id. at 38.) Levin testified about the DNA evidence in this case and his investigation regarding Cross' report.

Neither the Government nor Defendant called the anonymous 911 caller to testify at trial. Defendant did not attempt to subpoena the witness for trial. And before closing arguments, the Court recessed to discuss final jury instructions with counsel.

### D. Denial of the Missing Witness Jury Instruction

During the charge conference, Defendant argued that he was entitled to a missing witness jury instruction because the 911 caller did not testify as a Government witness. (Id. at 59.) In this regard, Defendant submitted the following instruction in conformance with Third Circuit Model Criminal Jury Instruction 4.16:

> You may have heard evidence about the 911 caller who has not been called to testify. The defense has argued that the 911 caller's testimony could have been important to this case and that the 911 caller was available as a witness only to the Government and not to the defense.
>
> If you find that the Government could have called the 911 caller as a witness and that the 911 caller would have given important new testimony, and you also find that a 911 caller was available as a witness only to the Government and not to the defense and that the Government failed to call the 911 caller, you are permitted but not required to infer that the 911 caller's testimony would have been unfavorable to the Government.
>
> You must decide whether you believe that the 911 caller would have testified unfavorably to the Government. You should not draw such a conclusion if the witness was equally available to both parties or if the witness' testimony would have merely repeated the testimony of other witness' or evidence already presented in the case.

11

(Id. at 70-71.)

Defense counsel contended that the 911 caller was only available to the Government and that her testimony was important to explain the meaning of the term "wife beater." (Id.) Defense counsel reasoned that the 911 caller's testimony was necessary because in ATF Agent Hines' Report of Interview, the caller described the garment wore by the gunman as a light-colored "top" or "tank top," not a "wife beater." (Id. at 83.)

The Government opposed the instruction, arguing as follows:

> We interviewed the witness, Your Honor. If your Honor recalls, it was part of the litigation in this case. And that witness' statement, absent the identification of the witness, was given to the defense. The defense never sought to call that witness afterwards, and incidentally, that witness did not have any desire – when we asked the witness, "Do you want to talk to the defense," she said no, she didn't want to talk to the defense. But she gave a statement.

(Id. at 72-73.)

The Government further argued that the testimony would have been cumulative because the call was already played for the jury. (Id.) The Government also asserted that if called, the witness' testimony would have been helpful to the Government, not the defense, since she had said in her interviews that he was approximately 5'8" in height, and wore a black ball shorts and a light-colored tank top.

The Court first noted that the Government had an explanation for not calling the 911 caller (Id. at 69), and stated as follows:

> But we do have an explanation. The explanation is that the law does not require the person's identity to be disclosed. There is an explanation for failure to call a witness. The–at least–let's see. "Not called to testify on behalf of the party for whom the witness– available without an explanation for the failure to call the witness." This is a confidential person who makes an emergency 911 call. I don't see how we can get over that.

(Id. at 69-70.)

The Court then stated as follows regarding the evidence before the jury on the identity of the 911 caller and the subsequent interview by Agent Hines:

> …We have no evidence on this record at all as to whom the witness was available to. We have no record on this–no testimony on this record that this witness was even interviewed by the Government. It's just – right now, I – you know, when I read the missing witness instructions, that the jury is being asked to speculate based on the evidence in this case.

(Id. at 81-82.)

The Court denied Archie's request for the jury instruction because there was no evidence offered at trial that would support giving this instruction. (Id. at 92-93.) Specifically, the Court emphasized as follows:

> On the record before this jury – and that's – that is the critical record – on the record, there is nothing to show that the witness' identity was not made available to the defense. And, you know, unless I take notice of it somehow, unless some – you know – it's just not before the jury in this case. Also, how do we let a jury speculate about these things? That's what I'm having trouble with. When I look at the witnesses available to one party and not the other, the party to whom the witness is available does not call the witness and provides no explanation for that failure; the witness is not prejudiced against that party and the witness would give relevant and non-cumulative testimony. Based upon this statement, I think the last point is made, but we don't have anything on the record as to any of these things before this jury. It would be sheer speculation.

(Id.)

Thus, there was nothing before the jury to support giving the proposed instruction. (Id.) While the Court denied the request, it noted that Defendant's counsel was free to argue to the jury that a reasonable doubt could be raised because the Government did not call the witness. (Id. at 93.) Accordingly, during defense counsel's closing argument, he argued:

> [I]t's the Government that bears the burden here of proof beyond a reasonable doubt. The description is of the man with the gun wearing a wife-beater. The Government wants you to assume that

13

> a wife-beater is a tank top. There's no evidence of that. The 911 caller wasn't called to testify about that. There's no expert linguist to come in and say that's a common parlance for a tank top.

(Id. at 116.)

Subsequently, on May 16, 2019, the jury returned a verdict and found Archie guilty. (Doc. No. 145.)

### III.   ANALYSIS

In his Motion for a New Trial and Supplemental Motion, Archie moves for a new trial under Federal Rule of Criminal Procedure 33.[5]  A Court may grant a new trial if it believes that there is a serious danger that a miscarriage of justice has occurred, that is, that an innocent person has been convicted. United States v. Johnson, 302 F.3d 139, 150 (3rd Cir. 2002). When a district court evaluates a Rule 33 motion, it does not view the evidence favorably to the Government. (Id.) Instead, the court exercises its own judgment in assessing the Government's case. (Id.) A decision to grant or deny a Motion for New Trial lies within the discretion of the district court. United States v. Cimera, 459 F.3d 452, 458 (3rd Cir. 2006).

Against this legal backdrop, Defendant argues that he is entitled to a new trial because the Court erred in denying his request for a missing witness jury instruction based on the Government's failure to call the 911 caller as a witness to testify what she meant by the term "wife beater." (Doc. No. 147.)

---

[5]   Federal Rule of Criminal Procedure 33(a) provides as follows:

> (a) Defendant's Motion. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

In United States v. Ariza-Ibarra, 651 F.2d. 2, 15-16 (1st Cir. 1981), a case heavily relied upon in the commentary to the Third Circuit Model Instruction on a missing witness, the court listed the elements that must be satisfied before a missing witness instruction should be given. Thus, a missing witness instruction is appropriate only where the witness in question (1) is available to one party and not the other; (2) is not called to testify on behalf of the party to whom the witness is available without an explanation for the failure to call the witness; (3) is not prejudiced against the party to whom the witness is available; and (4) would give relevant, non-cumulative testimony.  United States v. Norris, 753 F. Supp. 2d 492, 524 (E.D. Pa. 2010), aff'd, 419 F. App'x 190 (3d Cir. 2011) (citing Ariza-Ibarra, 651 F.2d at 15-16; United States v. Vastola, 899 F.2d 211, 235 (3d Cir. 1990) ("[A] missing witness instruction is not appropriate when the witness is available to both the defense and the prosecution."), vacated on other grounds, 497 U.S. 1001 (1990.))

In explaining the standard for a missing witness instruction, the District Court in Norris observed

> Some Third Circuit cases suggest there is an affirmative entitlement to a missing witness instruction if the elements for the instruction are met.  See e.g., United States v. Drozdowski, 313 F.3d 819, 824 (3rd Cir. 2002) (stating a "defendant is entitled to an absent witness instruction when the testimony of a witness can only be produced by the Government" and that the instruction "is to be given in a case where the government fails to produce evidence.")  However, each party is the captain of their own case and "a party's failure to call a witness does not necessarily imply that the witness's testimony would have been unfavorable to that party." United States v. Busic, 587, 586 (3rd Cir. 1978.)  Thus, district courts should not treat missing witness instructions as a matter of right.[6]

---

6   The comment to Section 4.16 of the Third Circuit Model Jury Instructions advise,

> It is not clear whether the Defendant is entitled to a missing witness instruction or whether the trial court has discretion to determine whether to give the instruction.  However, the Third Circuit has

15

(Id. at 524-25.)

In Norris, the court found: (1) Defendant's contention that the witnesses were not available to him was sheer speculation; (2) there was no indication that the witness's testimony would not have been cumulative; and; (3) there was a satisfactory reason for failing to call the witness. (Id.) Therefore, the court's refusal to give the missing witness instruction was not grounds for granting a new trial. (Id.)

In United States v. Busic, the Third Circuit Court of Appeals noted:

> Every experienced trial lawyer knows that the decision to call a witness often turns on factors which have little to do with the actual content of his testimony. Considerations of cumulation and jury fatigue may preclude calling a witness who is entirely helpful; calculations that a witness may help a lot but hurt a little may compel restraint when counsel believes that his burden is already met. Then, too, questions of demeanor and credibility, hostility, and the like may influence the government not to produce a witness whose testimony might be entirely harmful to the defendant. And, of course . . in many instances, a witness's testimony might have been neither [h]elpful nor [a]dverse to the party who failed to call him.

587 F.2d at 586.

Thus, there are ample reasons a party may decide not to call a witness that do not imply the witness' testimony would have been unfavorable to that party.

Further, the First Circuit in Ariza-Ibarra explained the rationale for the missing witness instruction as follows:

---

noted that a party may decide not to call a witness for a wide range of reasons. See United States v. Busic, 587 F.2d 577, 586 (3d Cir. 1978), rev'd on other grounds, 446 U.S. 398 (1980). As a result, the better course seems to be to treat the question as falling within the Court's discretion.

16

> In the absence of a satisfactory explanation, when a party fails to call a witness whom that party would ordinarily produce if the facts known by the witness were favorable to that party, the jury may infer that the absent witness's testimony would have been adverse to that party. This adverse inference may not be reasonably drawn, however, unless the <u>evidence</u> shows that the witness is available to testify on behalf of the party, that the testimony of the witness would be relevant and noncumulative, and that the witness is not prejudiced against the nonproducing party.

<u>Ariza-Ibarra</u>, 651 F.2d at 15-16 (citations omitted) (emphasis added.)

Therefore, as set forth in <u>Ariza-Ibarra</u>, there must be evidence of the factors in order to grant a missing witness jury instruction. <u>See id.</u> As explained below, the evidence here was insufficient to support giving this instruction.

**A. The Witness' Availability Was Not Before the Jury.**

The first <u>Ariza-Ibarra</u> factor states that a missing witness instruction is appropriate where the witness in question is available to one party and not the other. Here, there was no evidence on the record before the jury as to whom the 911 caller was available to. All the jury knew was that there was a 911 call, the person was not identified at trial, and was not called as a witness. Neither party presented evidence to the jury that the 911 caller was interviewed by an ATF agent and that the 911 caller declined to be interviewed by the defense. In short, there was no evidence before the jury that the 911 caller was available to be a witness only to the Government.

As noted previously, when the Court considered the appropriateness of the instruction, it stated as follows:

> We have no evidence on this record at all as to whom the witness was available to. We have no record on this–no testimony on this record that this witness was even interviewed by the Government. It's just – right now, I – you know, when I read the missing witness instructions, that the jury is being asked to speculate based on the evidence in this case.

(Doc. No. 154 at 81-82.)

Further, as the Court explained during trial,

> On the record before this jury–and that's–that's the critical record, there is nothing to show that the witness' identity was not available to the defense… And… unless I take notice of it somehow…it's just not before the jury in this case.

(Id. at 92.)

Here, based on the language in Ariza-Ibarra, unless the evidence shows that the witness was only available to testify on behalf of the Government, no adverse inference can be drawn. Because there was no such evidence in the record at trial, giving the missing witness instruction would have caused the jury to improperly speculate as to which party the witness was available to. Moreover, the jury would be speculating that the testimony would be adverse to the Government. Accordingly, for these reasons, the instruction was not warranted.[7]

**B. The Government had a Reasonable Explanation for Not Calling the Witness.**

The second Ariza-Ibarra factor is that a missing witness instruction is appropriate where the witness in question is not called to testify on behalf of the party to whom the witness is available without an explanation for the failure to call the witness. As noted above, there was no evidence at trial that the witness was only available to the Government, and not the defense. In view of this lack of evidence, there was no reason for the Government to provide an explanation of why the witness was not called to testify.

But even if there was evidence on the record at trial as to whom the 911 caller was available to, which there was not, the Government had a satisfactory explanation for not calling the witness.

---

[7] When the 911 caller was asked during the ATF interviews whether she wished to talk to the defense, she declined and said that she wished to remain anonymous. The defense could have requested the Court to have the 911 caller served with a subpoena to testify at trial but chose not to do so. In addition, the fact that she wanted to remain anonymous meant that if the Government wanted to use her at trial, it too would have had to subpoena her.

Again, as explained in the Opinion dated September 28, 2017, the Court agreed with the Government's assertion that it must protect 911 callers from retribution and encourage citizens to report crimes by dialing 911 when necessary. (Doc. No. 76.) The Court reasoned that because the facts of this case involve a dangerous situation where, as mentioned in the 911 call, Defendant, with a firearm, was "scoping someone out," the caller's safety is a legitimate interest in support of nondisclosure. (Id. at 7-8.) Further, the Court noted that the public interest in protecting the flow of information is an overriding factor in this case, favoring nondisclosure of the 911 caller's identity. (Id.) Thus, the Government had a legitimate reason to protect the caller's identity and safety.

Additionally, the caller was asked whether she wished to speak to the defense during the ATF interview. (Doc. No. 159.) She declined and wished to remain anonymous. (Id.) As the Court stated during the charge conference, the law does not require that the 911 caller's identity be disclosed. (Doc. No. 154 at 69.) The 911 caller did not know Archie and was only a confidential person who made an emergency 911 call. Therefore, for all these reasons, the Government had a reasonable explanation for not calling the witness.

**C. The Witness is Not Prejudiced Against the Government.**

The third Ariza-Ibarra factor is that a missing witness instruction is appropriate when the witness in question is not prejudiced against the party to whom the witness is available. Here, it appears that the 911 caller was not prejudiced against the Government. During the conference on the jury instructions, the Government argued that the witness' testimony would have been favorable to them. (Id. at 85.) Thus, although this factor apparently favors giving this instruction, given the other Ariza-Ibarra factors that were not met, the missing witness instruction was properly denied.

19

**D. The Witness Would Have Given Relevant, Non-Cumulative Testimony.**

The fourth Ariza-Ibarra factor is that a missing witness instruction is appropriate where the witness in question would give relevant, non-cumulative testimony. The defense argues that relevant, non-cumulative testimony would be an explanation by the 911 caller of what she meant by the term "wife beater." In the 911 call, the witness stated, "[h]e has a gray–oh, he has a wife beater on." Though it appears that the term "wife beater" refers to a tank top, and the 911 caller told Agent Hines that Archie was wearing a tank top, without using the word "wife beater," it is evident that her explanation of wife beater would be relevant and non-cumulative. But to repeat, although this element of the missing witness instruction favors the defense, each element must be met before the instruction is warranted.

**IV.     CONCLUSION**

In sum, of the four factors that are required to be present before a missing witness instruction is warranted, the first two were not met. To avoid improper speculation by the jury, the Court exercised its discretion and declined to give the instruction. Thus, the interests of justice do not require that Archie be afforded a new trial based on the denial of this missing witness jury instruction. Accordingly, for the foregoing reasons, the Motion for a New Trial (Doc. No. 147) and Supplemental Motion for a New Trial (Doc. No. 156) will be denied. An appropriate Order follows.